UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| KAREN ST. PIERRE, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Docket no. 1:12-cv-0265-NT |
| EASTERN MAINE MEDICAL | ) |
| CENTER, et al., | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER
ON MOTIONS TO DISMISS**

This case comes before the Court on three motions to dismiss. The first, by Defendant Danette McGowan, seeks dismissal of Count V of the Second Amended Complaint, (intentional interference with economic relationships) pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted (ECF No. 30). The second, by Defendants Paula Turner, Theresa Blanchard,[1] Karen Charpentier, Jayne Libbey, and Mary Newman also seeks to dismiss Count V pursuant to Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim and 12(b)(1) for lack of subject-matter jurisdiction (ECF No. 31). Finally, Defendant Kathleen A. Patin seeks dismissal of Count IV of the Second Amended Complaint (intentional infliction of emotional distress), under Federal Rule of Civil Procedure 12(b)(6) on the ground that it fails to state a claim for which relief may be granted (ECF No. 33). For the reasons discussed below, the motions are **GRANTED**.

---

[1] The Complaint was filed against "Terry Bourgoin." Counsel for Ms. Blanchard notes that Ms. Blanchard was "formerly Bourgin." Defs. Turner, Blanchard, Charpentier, Libbey, and Newman's Mot. to Dismiss 1.

## ALLEGATIONS OF THE COMPLAINT

The Court hereafter summarizes the facts as alleged in the Second Amended Complaint. These are not findings of fact by the Court, but are the Plaintiff's allegations and assumed to be true solely for purposes of the Court's analysis on the Defendants' motions to dismiss.

On November 15, 2012, the Plaintiff filed a Second Amended Complaint in this case (the "**Complaint**"), which tells a tale of workplace bullying in Grant 7, the obstetrics and gynecology ward at Eastern Maine Medical Center (the "**Hospital**") by Defendants Charpentier, Libbey, McGowan, Newman, Turner and Blanchard (the "**Nursing Defendants**") and Defendant Patin (a secretary who at one time worked at the Hospital).

The Complaint alleges that on May 5, 2011, the Plaintiff quit her job as a registered nurse at the Hospital after twenty-five years of employment. The Plaintiff's troubles began over two years earlier, in February of 2009, when she experienced a hypertensive crisis while at work, followed by an injury to her right knee. Together, these conditions caused the Plaintiff to be placed on light duty. The Plaintiff alleges that Defendant Turner maliciously assigned her tasks which exceeded her light duty restrictions.

Thereafter some of the other Nursing Defendants began to refer to the Plaintiff in offensive terms. In one incident that took place on or about July 20, 2009, Defendant Patin allegedly sent an anonymous note to the Plaintiff stating: "Blond Fat Ass Bitch. . . Keep Eating, Looking at Cruises, and Singing Your Idol

2

Songs. We Love It." Defendants Newman and Libbey are alleged to have been seen talking to Defendant Patin within a few days before the note was sent to the Plaintiff.

The Plaintiff asserts that this behavior was intended to provoke another hypertensive crisis and to cause the Plaintiff to leave work, which it did. Defendant Libbey, who is alleged to have been one of the authors of the note along with Defendant Patin, is also alleged to have mocked the Plaintiff upon her return to work, stating "So, how is your blood pressure now Karen?" The Plaintiff reported this incident to the Hospital's human resources department, but they declined to take action, and thereafter the Nursing Defendants increased their hostile actions against the Plaintiff.

Defendant Newman is alleged to have made unwelcome comments about the Plaintiff's breast size at some point in time. The Plaintiff alleges that in December of 2009, Defendant Charpentier informed Defendant Libbey and other nurses that "we are going to do something about that" referring to the Plaintiff who was standing nearby. Defendant Libbey is alleged to have nodded in agreement.

Defendant McGowan was the supervising nurse on Grant 7. On January 7, 2010, Defendant McGowan is alleged to have told the Plaintiff in a rude and intimidating tone that the Plaintiff would not be placed as a charge nurse on the floor because Defendants Charpentier, Libbey, and Newman opposed this placement and because Defendant McGowan herself supported their opposition. Following this incident, the Plaintiff took another medical leave of absence to

3

address a severe hypertensive reaction to workplace stress. On January 14, 2010, Defendant McGowan confronted the Plaintiff, angrily telling her that the Plaintiff was responsible for a meeting that Defendant McGowan was required to attend involving the head of the Hospital's human resources department and union officials.

This precipitated a period in which the Nursing Defendants began making purportedly false accusations against the Plaintiff that other nurses were complaining about her. Yet another promised opportunity to serve as a charge nurse was revoked by Defendant McGowan after McGowan made a false allegation that a coworker had raised issues involving the Plaintiff. The Plaintiff claims that Defendants Blanchard and Turner repeatedly bad-mouthed the Plaintiff at the nursing station on Grant 7 in the presence of other staff and that Defendant Blanchard at one point confronted the Plaintiff and then refused to help the Plaintiff with patients. Defendants Turner, Charpentier, and Newman are also accused of having refused to assist the Plaintiff with patients.

In July of 2010, Defendant Blanchard circulated a petition signed by Defendants Charpentier, Newman, and Turner questioning Plaintiff's professionalism. Plaintiff alleges that Defendant McGowan knew and permitted the petition to be circulated. On July 28, 2010, the Plaintiff requested to meet with the Hospital's human resources department.

On August 6, 2010, Defendant McGowan is alleged to have written up the Plaintiff on false charges and to have berated the Plaintiff in the presence of other

4

employees. The Plaintiff complained to the Hospital about this treatment, and was forced to again use medical leave in the winter and spring of 2011 to address an increase in the Plaintiff's hypertension and emerging symptoms of post-traumatic stress disorder.

In the ultimate episode leading to the Plaintiff quitting, on or about April 15, 2011, the Plaintiff informed Defendant Turner's secretary that she was sick, that she felt like she may pass out, that she had blurry vision and could not read. Rather than provide medical attention to the Plaintiff, Defendant Turner reported the Plaintiff for working while under the influence of narcotics. The Plaintiff alleges that she also told a non-Defendant nurse at the Hospital that she needed medical attention but that, despite the fact that her face was visibly swollen and she was slurring her speech, the Plaintiff was asked by Hospital employees to leave the Hospital. The Plaintiff left the Hospital, severely humiliated. She claims that, as a result of these collective actions, the Nursing Defendants achieved their goal of forcing the Plaintiff to quit her job, resulting in the Plaintiff's constructive discharge from her employment.

The first three counts of the Complaint allege disability discrimination (Count I), violation of the federal Family and Medical Leave Act (Count II), and violation of the federal Emergency Medical Treatment and Active Labor Act (Count III) against the Hospital. Count IV alleges intentional infliction of emotional distress against Defendant Patin, and Count V alleges intentional interference with

economic relationships against Defendants Charpentier, Libbey, McGowan, Newman, Turner, and Blanchard.[2]

## LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) and 8(d)(1). The First Circuit recently observed:

> To survive a motion to dismiss for failure to state a claim, a complaint need not present "detailed factual allegations," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007), but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). The precise parameters of the plausibility standard are "still a work in progress," *Menard v. CSX Transp., Inc.,* 698 F.3d 40, 45 (1st Cir. 2012), but, at bottom, a complaint's non-conclusory factual content must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal,* 556 U.S. at 663. An "unadorned, the-defendant-unlawfully-harmed-me accusation" will not do. *Id.* at 678.

*Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 638-39 (1st Cir. 2013) (alteration in original).

## DISCUSSION

### A. Sufficiency of the Plaintiff's Claim for Intentional Interference with Economic Relations (Count Five)

A claim for intentional interference with economic relations requires a plaintiff to demonstrate that the defendant interfered with the plaintiff's economic relationships through either intimidation or fraud and that this interference caused

---

[2] Count V is the only count against Defendants McGowan, Turner, Blanchard, Charpentier, Libbey, and Newman, and Count IV is the only count against Defendant Patin.

the plaintiff damages. *Petit v. Key Bank of Maine,* 688 A.2d 427, 430 (Me. 1996); *Barnes v. Zappia,* 658 A.2d 1086, 1090 (Me.1995). The Complaint does not allege fraud. It does allege a situation in which the Defendants communicated to the Plaintiff through words and actions that she would be ostracized and belittled, that her job would be obstructed, and that the Defendants would withhold aid from the Plaintiff unless or until she quit her job, which, eventually, she did. This states a claim for intimidation against *the Plaintiff*. But the Nursing Defendants claim that Count V fails to state a claim because it does not allege that they intimidated a *third party*.

Under the well-marked boundaries for this tort in Maine, "A person engages in intimidation when that person: (1) communicates a statement [or threat] to a third person; (2) that suggests adverse physical, economic, or emotional consequences to the third person; (3) for the purpose of inducing the third person to act [or fail to act] regarding the plaintiff; and (4) the third person acts based on the statement or threat, damaging the plaintiff." D. Alexander, *Maine Jury Instruction Manual* § 7-33 (4th ed. 2008) (brackets in original); see also Currie v. Indus. Sec., Inc., 915 A.2d 400, 408 (Me. 2007) (intimidation exists when defendant communicates "to the party with which the plaintiff had contracted" adverse economic consequences for continuing its contract with plaintiff (citing *Pombriant*, 562 A.2d at 659). Maine's Law Court has not yet been asked to recognize a claim of intentional interference with economic relations where the fraud or intimidation is

7

directed at the plaintiff herself, as opposed to a third party. The Plaintiff requests that this Court find that the Law Court will recognize this form of the tort.

Section 766A of the Restatement (Second) of Torts recognizes the tort of intentional interference with another's performance of his own contract. Although Maine law generally follows the Restatement, *see Sandler v. Calcagni,* 565 F. Supp. 2d 184, 193 (D. Me. 2008), there is reason to tread lightly in the area of intentional interference with economic relations. Prosser and Keeton have noted:

> [t]he courts have more or less continuously expanded the tort, with the effect, perhaps, that the uncertainties in its definition have become more rather than less significant. Although the tort continues to find supporters, it has been subjected to serious criticisms on a wide range of grounds from economics to justice to free speech, with a good deal of emphasis on the idea that an actor should not be held liable for interference with contract unless the interference is accomplished by unlawful means or an independent tort.
>
> All of this leaves open a good many questions about the basis of liability and defense, the types of contract or relationship to be protected, and the kind of interference that will be actionable, each of which requires no little attention before the beginning of an answer can be made.

W. Prosser & W. Keeton, *The Law of Torts,* § 129 at 979 (5th ed. 1984) (footnotes omitted).

In a dissenting opinion in *Pombriant v. Blue Cross/Blue Shield of Maine*, 562 A.2d 656 (Me. 1989), then-Justice Hornby noted that the Law Court:

> has wisely maintained the requirement of intimidation or fraud as a necessary element in an action for tortious interference with a contractual relationship . . . rather than adopt the open-ended definition of other courts and the Restatement (Second) of Torts § 767.

*Id.*, 562 A.2d at 661 (internal citations omitted).

This Court has also previously recognized that "[t]he law of other states that have adopted similar definitions of this tort requires that the conduct be directed toward third parties." *White v. Meador*, 215 F. Supp. 2d 215, 219 (D. Me. 2002) (citing, *e.g.*, *Zakutansky v. Bionetics Corp.*, 806 F. Supp. 1362, 1366 (N.D. Ill. 1992) (Illinois law)).

Finally, the Court must contend with the prudential concern that, generally speaking, it should not be engaged in the practice of expanding Maine law. *See, e.g.*, *Braga v. Genlyte Grp., Inc.*, 420 F.3d 35, 42 (1st Cir. 2005) ("A federal court sitting in diversity must 'take care not to extend state law beyond its well-marked boundaries in an area . . . that is quintessentially the province of state courts.'" (quoting *Markham v. Fay*, 74 F.3d 1347, 1356 (1st Cir. 1996)). The Plaintiff brought her claims in the first instance before this Court rather than before the Maine Superior Court. Under the circumstances, the Plaintiff "cannot expect that new trails will be blazed." *See Phoung Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 89 (1st Cir. 2007) (quoting *Ryan v. Royal Ins. Co. of Am.*, 916 F.2d 731, 744 (1st Cir.1990)).

For these reasons, the Court declines to recognize a claim under Maine law for tortious interference with economic relations where the tortious conduct is directed at the plaintiff as opposed to a third party. Accordingly, the Plaintiff fails to state a claim under Count V for which relief may be granted.[3]

---

[3] Since the Plaintiff fails to state a claim under Count V, the Court does not reach the Nursing Defendants' alternative arguments for dismissal, that this count is preempted by Maine's Workers Compensation Act, 39-A M.R.S. §§101-909, by the Labor Management Relations Act of 1947, 29 U.S.C. §§ 141-187, and/or by the National Labor Relations Act, 29 U.S.C. §§ 151-169.

### B. Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress, a plaintiff must allege the following four elements:

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct;
(2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community";
(3) the actions of the defendant caused the plaintiff's emotional distress; and
(4) the emotional distress suffered by the plaintiff was "so severe that no reasonable [person] could be expected to endure it."

*Curtis v. Porter*, 784 A.2d 18, 22-23 (Me. 2001) (alteration in original) (quoting *Loe v. Town of Thomaston*, 600 A.2d 1090, 1093 (Me. 1991)).

The First Circuit has observed that:

Under Maine's jurisprudence, a court properly may determine, as a matter of law, whether undisputed (or assumed) facts suffice to state a claim for intentional infliction of emotional distress. *See Gray v. State*, 624 A.2d 479, 484 (Me. 1993). If those facts would not allow a rational factfinder to classify the defendant's conduct as extreme or outrageous, or if any other element of the tort is lacking, then dismissal is proper.

*LaChapelle v. Berkshire Life Ins. Co.,* 142 F.3d 507, 511 (1st Cir. 1998), *see also Lougee Conservancy v. CitiMortgage, Inc.*, 48 A.3d 774, 784 (Me. 2012) (court decides in the first instance whether defendant's conduct can reasonably be seen as so extreme and outrageous to allow recovery).

Although the Complaint alleges conduct on the part of the individual Defendants that, taken together, would state a claim for intentional infliction of emotional distress, Count IV alleges intentional infliction of emotional distress against only one defendant, a former employee of the Hospital, Kathleen Patin.

10

Maine's Workers Compensation Act (the "**WCA**") prevents the Plaintiff from making this claim against the Nursing Defendants. *See Cole v. Chandler*, 752 A.2d 1189, 1195-96 (Me. 2000) (holding that 39-A M.R.S.A. § 104, the WCA's exclusivity provision, bars claims against co-employees for personal injuries, including mental distress, even where the alleged tort was intentional).

Patin is alleged to have been seen speaking with Defendants Newman and Libbey a few days prior to the arrival of the note in July of 2009. Second Am. Compl. ¶ 29. The Plaintiff alleges that "Defendants Libbey and Patin formulated the content of the letter and devised a scheme to send the letter anonymously as part of their effort to harass Plaintiff." Second Am. Compl. ¶ 30. The note stated: "Blond Fat Ass Bitch . . . Keep Eating, Looking at Cruises, and Singing Your Idol Songs. We Love It." Second Am. Compl. ¶ 27.

The Complaint also alleges that in contrast to the Nursing Defendants, Defendant Patin was a secretary who "at one time" worked on Grant 7 at the Hospital. Second Am. Compl. ¶ 13. The Court infers from the allegations of the Complaint that Defendant Patin was not the Plaintiff's coworker at the time the note was sent or at any time thereafter. *See* Second Am. Compl. ¶12. The Plantiff does not allege that Defendant Patin was involved in any of the other incidents which occurred after the note, or that Defendant Patin knew that the Plaintiff suffered from hypertension and had experienced a hypertensive crisis. *See* Second Am. Compl. ¶ 21.

Based on the allegations, which the Court must accept as true, Defendant Patin wrote an offensive note with the assistance of Defendant Libbey and sent it to the Plaintiff. The Plaintiff concedes in her opposition to Defendant Patin's motion to dismiss that "Defendant Patin played only a minor role at the outset," but she argues that a "minor player in an overall scheme" may be held liable when others take the tortious conduct to a more extreme level. Opp'n to Def. Patin's Mot. to Dismiss 7.

In support of this proposition, the Plaintiff points to *Curtis*, in which the Law Court found that the plaintiff, a pizza delivery person who was robbed and hit in the face, stated a claim for intentional infliction of emotional distress against a young woman, Lisa Gagne, who took part in the scheme by ordering the pizza, having it delivered to a vacant house, and telling the men who were to get the pizza "don't get caught." *Curtis*, 784 A.2d at 20-21.

> Maine does generally recognize that:
>
> "All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him."

*Cohen v. Bowdoin*, 288 A.2d 106, 111-112 (Me. 1972) (quoting W. Prosser, *The Law of Torts,* at 259 (3rd ed. 1964)). But this requires all of the participants to "pursue a common plan." *Id.* In *Curtis*, Gagne knew that the plan was to rob the plaintiff, and, although she did not know that the plaintiff would be punched in the face, the Law Court found that she knew or should have known that "planning a nighttime theft

 . . . may result in serious emotional harm to that delivery person." *Curtis*, 784 A.2d at 23. The facts of *Curtis* are a long way from the facts alleged here. Defendant Patin may be the author of a nasty note, but the allegations do not raise a plausible inference that she is part of the Nursing Defendant's scheme, which extended some twenty months after Defendant Patin sent the note. Particularly where Defendant Patin and Plaintiff were not coworkers and where Defendant Patin is not alleged to share the knowledge that the Nursing Defendants had of the Plaintiff's severe hypertension, the Court is unwilling to impose liability for the subsequent actions of the Nursing Defendants on Defendant Patin. *Cf. Curtis*, 784 A.2d at 23.[4]

Under Maine law, mere abusive language and insults do not constitute the type of outrageous and extreme conduct necessary to support a claim of intentional infliction of emotional distress. *Botka v. S.C. Noyes & Co.*, 834 A.2d 947, 951 (Me. 2003) (commercial landlord and business partner's insulting, imperious, harassing behavior, including initiation of a physical confrontation and threats to evict, insufficient to sustain claim for intentional infliction of emotional distress); *Pylypenko v. Bennett,* No. CV-09-690, 2011 WL 1338088 (Me. Super. Feb. 23, 2011)

---

[4] Paragraph 35 of the Complaint alleges that after the Plaintiff reported the note to the Hospital the "Defendants increased their hostile actions directed at Plaintiff." Paragraph 41 of the Complaint alleges that after she had a confrontation with McGowan, "Defendant McGowan and other Defendants began making false accusations that other nurses were complaining about Plaintiff." To the extent these allegations are meant to include Defendant Patin, they fail to include sufficient non-conclusory factual content to allow the Court to infer that Defendant Patin is liable for the conduct alleged. *See Iqbal*, 556 U.S. at 663. The allegations regarding increased hostile actions and false accusations all concern conduct by defendants other than Defendant Patin. Since Defendant Patin was not a coworker and was not alleged to have been on the Hospital's premises during the relevant period, it would be implausible to infer absent other factual underpinning that she was involved in the alleged increased hostile actions and false accusations against the Plaintiff.

("Insulting or abusive language has likewise been found short of the extreme and outrageous conduct required.")

Sending a note expressing a mean opinion is simply not so outrageous and extreme as to support a claim for intentional infliction of emotional distress. The Court might have been able to infer that Defendant Patin was involved in a broader scheme had she been a coworker of the Plaintiff or had she continued her involvement with the Nursing Defendants. But Defendant Patin is absent from the scene after the initial note was sent. Furthermore, there is no allegation which allows the Court to infer that Defendant Patin intended the Plaintiff to suffer a hypertensive crisis or that she could have foreseen such an event. Nor is the mailing of a mean note enough to put a person on notice that serious emotional harm might result. The Plaintiff's intentional infliction of emotional distress claim against Defendant Patin is not supportable on the allegations of the Complaint.

## CONCLUSION

For the reasons stated, the motions of Defendants McGowan, Turner, Blanchard, Charpentier, Libbey, and Newman to dismiss Count V are **GRANTED**, and Defendant Patin's motion to dismiss Count IV is also **GRANTED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 30th day of September, 2013.